IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| SANDRA ALCORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:17-cv-00227 |
| | ) | |
| CREST ULTRASONIC CORP., and | ) | By: Elizabeth K. Dillon |
| RELIANCE SPECIALTY PRODUCT, INC., | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Sandra Alcorn filed this action against defendants Crest Ultrasonic Corp. and Reliance Specialty Products, Inc., asserting claims of negligence and breach of warranties. The case is presently before the court on defendants' motions for summary judgment. (Dkt. Nos. 53, 56.) The motions have been fully briefed, the court heard argument on the motions, and the court has considered all of the written submissions. For the reasons set forth below, the court concludes that plaintiff's claims are barred by the limitations period applicable to personal injury claims. Thus, the defendants' motions for summary judgment will be granted.

I. FACTUAL BACKGROUND

This action relates to Alcorn's employment at John C. Nordt Company (Nordt) and her exposure to the chemical solvent 1-bromopropane, which was used in her operation of two forward degreasing machines. (Compl. ¶ 6, Dkt. No. 1.) Nordt used these machines to manufacture jewelry. (Med. Report 29, Dkt. No. 54-4.) Crest manufactured and sold the machines to Nordt. (Compl. ¶ 7.) Reliance designed and manufactured the solvent for the machines. (Compl. ¶ 13.)

Alcorn worked at Nordt from 1985 to 2015. (Alcorn Dep. 52, Dkt. No. 54-1.) She started working with the forward degreasing machines using 1-bromopropane in 2013. (*Id.* at 84.) From the time she began working with the degreasing machines and 1-bromopropane, Alcorn developed skin

lesions in the form of small "red bumps" on her hands and struggled with breathing. (*Id.* at 85, 223–24, 229.)

From April to June 2014, she experienced memory loss, paranoia, anxiety, depression, and various hallucinations. (*Id.* at 229–30, 232.) These symptoms manifested during one particular incident in April 2014 ("the deer incident"), when Alcorn avoided a deer carcass on the road. (*Id.* at 234.) After she avoided the deer and drove to a car wash, Alcorn hallucinated that a man was watching her as she washed her car. (*Id.* at 235–36.) She also hallucinated that someone followed her home. (*Id.* at 236–37.) From that point on, Alcorn hallucinated that people were following her. (*Id.* at 237, 347–49.) When Alcorn told her daughter this, her daughter told her she was being paranoid. (*Id.* at 373.)

In July 2014, Alcorn started making comments at work that people were accusing her of stealing a ring, although no one ever made such accusations. (*Id.* at 338–39.) Later that month, Alcorn told a coworker that she felt like she was being followed. (*Id.* at 340.) In July or August 2014, Alcorn believed that people were posting about her on the internet. (*Id.* at 379–80.)

Sometime between June and August 2014, Alcorn was confronted about her behavior at Nordt and advised to see a counselor. (*Id.* at 239.) When Alcorn was referred to the Employee Assistance Program in August 2014, she met with Katie Hunley in the program and told her about the deer incident and her belief that she was being followed. (*Id.* at 351–52, 371–73.) Alcorn declined to follow Hunley's recommendation to receive a psychiatric evaluation. (*Id.* at 375.)

In September 2014, Alcorn saw her primary care physician, Dr. Brackenrich, who prescribed her Celexa, an anti-depressant. (*Id.* at 241–42.) In October 2014, Alcorn erroneously believed people were spying on her through the phone, watching her through the television, and listening to her phone conversations. (*Id.* at 355.)

Due to these symptoms, Alcorn was evaluated by several medical experts. Dr. Conley

2

conducted a neuropsychological evaluation of Alcorn and noted in his report that she began experiencing psychotic symptoms in April 2014 "due to toxic encephalopathy caused by chronic exposure to solvents . . . given her 30 year employment in jewelry manufacture." (Med. Report 27, 29.) Dr. Kramer's neuropsychiatry evaluation of Alcorn found that her "psychotic symptoms manifested after working with 1-bromopropane . . . for nearly a year," while establishing the start of her exposure to 1-bromopropane as June 2013. (*Id.* at 72–73.) Dr. Brackenrich, Alcorn's primary care physician, and Dr. Desai, Alcorn's treating psychiatrist, found that Alcorn was first exposed to 1-bromopropane in June 2013, and worked with the solvent "for nearly a year prior to her development of psychiatric symptoms." (*Id.* at 4–5, 53, 55.)

Plaintiff's experts have offered opinions relevant to the limitations issue. Dr. Sanderson concluded that Alcorn's "neurological symptoms during the Spring/Summer of 2014" were "most likely caused by her occupational exposures to 1-bromopropane at [Nordt]." (Sanderson Report 6, Dkt. No. 54-5.) Dr. Cramer's independent medical evaluation recounts the deer incident from "mid-2014" and concludes that "[c]hronic, toxic-level exposure to 1-bromopropane caused significant, ongoing, and more likely than not permanent neuropsychiatric effects." (Med. Report 14.) Last, Dr. Thrasher's environmental toxicology report noted that Alcorn's "paranoid behavior" and "psychiatric symptoms suddenly appeared around April 2014," and found "that the 1-bromopropane and corresponding bromine intoxication . . . are responsible for Ms. Alcorn's . . . related psychiatric symptoms." (Thrasher Report 5, 13, 17, Dkt. No. 54-8.)

Alcorn alleges that her exposure to 1-bromopropane resulted in "chronic bromide toxicity and its devastating, permanent effects on her health." (Compl. ¶ 7(c).) The resulting "serious and permanent injuries" include "paranoid behavior, hallucinations, psychotic episodes, memory problems and depression, cutaneous manifestations (skin blisters and lesions), hypothyroidism, recurrent sinusitis, and frequent headaches." (*Id.* ¶ 8.)

3

Alcorn filed suit on November 7, 2016. Her negligence claims allege: 1) Crest negligently failed to manufacture the machines in a reasonably safe manner and warn operators of the dangers associated with the machines, (*id.* ¶ 12); and 2) Reliance negligently designed and manufactured the solvent to be unreasonably dangerous and failed to warn operators of "the dangers of direct exposure to the solvent," (*id.* ¶ 13.). Alcorn's breach of warranties claims allege: 1) Crest breached express and implied warranties by introducing the unreasonably dangerous degreasing machines into commerce, (*id.* ¶ 16); and 2) Reliance breached express and implied warranties by introducing the unreasonably dangerous solvent into commerce, (*id.* ¶ 17.).

Defendants moved for summary judgment on all claims in the complaint.[1] Alcorn filed a response in opposition.[2] Reliance filed a reply, and both Reliance and Crest filed supplemental replies. The court held a hearing on the motions on August 24, 2018, and they are now ripe for review.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when a rational trier of fact, considering the evidence in the record as a whole, could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)). Stated differently, summary

---

[1] Defendants have also filed various motions to exclude a number of plaintiff's experts. (Dkt. Nos. 68, 70, 71, 79, 82, 84.) For summary judgment purposes, the court has considered their testimony and nonetheless concludes summary judgment for defendants is proper.

[2] Plaintiff filed a motion to seal documents attached to her response in opposition to defendants' motions for summary judgment. (Dkt. No. 64.) The court has reviewed the attached documents, but has not relied on them in this opinion. Thus, it is not necessary for the court to address the motion to seal, and it will be denied as moot.

4

judgment should be entered if the court finds, after a review of the record as a whole, that no reasonable jury could return a verdict for the non-moving party. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996).

As a federal court sitting in diversity, the court must apply and interpret the substantive law of the state in which the action arose. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). "[S]tate statutes of limitations are considered substantive law." *Bonham v. Weinraub*, 413 F. App'x 615, 617 (4th Cir. 2011). Accordingly, in Virginia, where this action arose, a plaintiff must bring an action for personal injury not later than two years after the cause of action accrues. Va. Code § 8.01-243(A). A cause of action accrues "from the time plaintiff was hurt." *See Locke v. Johns-Manville*, 275 S.E.2d 900, 905 (Va. 1981).

It is well settled in Virginia that the limitations period "begins running at the time of the initial injury, not at the time of diagnosis or discovery." *Wade v. Danek Med., Inc.*, 182 F.3d 281, 285 (4th Cir. 1999). The Virginia Supreme Court has specifically stated that "an injury is deemed to occur, and the statute of limitations period begins to run, whenever any injury, however slight, is caused by the negligent act, even though additional or more severe injury or damage may be subsequently sustained as a result of the negligent act." *St. George v. Pariser*, 484 S.E.2d 888, 890 (Va. 1997) (stating the indivisible cause of action rule). Therefore, if the defendants can show when an injury occurred, however slight that injury may have been, the statute of limitations begins to run from the date of the injury. *See id*. In cases of exposure, the court looks to when "[t]he plaintiff began to suffer adverse consequences from exposure." *Kumar v. The Glidden Co.*, No. 2:05-cv-499, 2006 WL 1049174, at *4 (E.D. Va. Apr. 13, 2006).

**B. Analysis**

Defendants argue that Alcorn's cause of action is barred by the statute of limitations. The court agrees.

5

"[T]he burden to prove facts necessary to establish an application of the statute of limitations is upon a defendant." *Locke*, 275 S.E.2d at 905 (citing *Louisville & Nashville R.R. v. Saltzer*, 144 S.E. 456, 457 (Va. 1928)). Alcorn argues that defendants have failed to meet their burden and that Alcorn's condition was "caused by both exposure that occur[ed] over time, and an accumulation in the body that occur[ed] over time to reach a threshold before it create[d] a harm." (Pl.'s Opp'n 4, Dkt. No. 65.) Alcorn also asserts that "[t]he best evidence for the presence of the harm or injury is the November, 2014 existence of the paranoid behavior followed soon thereafter by the thyroid problems." (*Id.* at 10.) Accordingly, Alcorn contends that bromine toxicity must reach a threshold of accumulation to have a harmful effect, and thus, determining the time of injury in this case "is a fact-dependent analysis" with a "complicated set of factors" that is appropriate for the jury to decide. (*Id.*)

Alcorn seems to rely on *Locke* for the proposition that her symptoms before November 2014 were simply isolated events, and not the argued "accumulation" of harm required to establish injury from exposure to 1-bromopropane. (*Id.* at 4–6.) Alcorn's reliance is misplaced.

In *Locke*, the plaintiff filed suit against asbestos manufacturers and sellers after the plaintiff inhaled asbestos fibers and contracted mesothelioma. *Locke*, 275 S.E.2d at 901. To determine when the cause of action accrued, the court analyzed whether the plaintiff was injured upon breathing the asbestos particles, or later developing lung-related abnormalities, noting that because "mesothelioma results *over a period of time*," there was no injury upon inhalation. *Id.* at 905. The court found that "there was no injury at the time of the wrongful act," and the mesothelioma "must first exist before it is capable of causing injury." *Id.* at 906. It reasoned that "the accrual point is when damage occurs," such as "when the disease manifests itself by symptoms, such as pain, discomfort or impairment of function." *Id.* The court held that the action was not time-barred because plaintiff's injury "did not spring up at infliction of the wrongful act," the inhalation of asbestos. *Id.* at 905, 907. Rather, the court found that the date of injury could be either when plaintiff experienced impairment of his lung

function in November 1977, or discovered a lung abnormality in May 1978. *Id.* at 905.

The plaintiff in *Locke* received a normal x-ray in April 1978 between the lung impairment in November 1977 and the lung abnormality in May 1978, and the court thereby found that the date of the plaintiff's injury *could* be May 1978. Alcorn appears to argue that the deer incident is analogous to the *Locke* plaintiff's November 1977 lung impairment, and thus, an isolated incident that cannot mark the date of injury. (Pl.'s Opp'n 5–6.) At a minimum, Alcorn uses *Locke* to argue that the date of her injury *could* be after November 2014. However, in this case, all experts ultimately agree that the several symptoms Alcorn experienced prior to November 2014—the relevant date for application of the statute of limitations—were caused by her exposure to 1-bromopropane.

At the hearing, Alcorn argued that the opinions of several experts raised a factual question as to Alcorn's date of injury. However, the record confirms that Alcorn was injured as a result of her exposure to 1-bromopropane prior to November 2014. First, Alcorn relies on Dr. Thrasher's report to incorrectly relate the deer incident to the *Locke* plaintiff's November 1977 lung impairment as a similar isolated event and therefore not linked to her injury caused by 1-bromopropane. (Pl.'s Opp'n 7; Thrasher Report 13.) However, Alcorn's description of the report diverges from Dr. Thrasher's opinions. Dr. Thrasher's report finds that the medical records which document the deer incident "show the beginning of paranoid behavior," and he concludes that the 1-bromopropane is responsible for her psychiatric symptoms. (Thrasher Report 12, 17.)

Alcorn also argues that Dr. Brackenrich's report and deposition raise questions as to Alcorn's date of injury. While Dr. Brackenrich's April 10, 2017 report notes Alcorn's psychiatric symptoms in 2015 (Med. Report 5), his later deposition—upon receiving more information—established that he believed the deer incident in April 2014 to be the start of her psychiatric problems. (Brackenrich Dep. 23–24, 46–47, Dkt. No. 76-1.) In addition, Alcorn brought to the court's attention Dr. Brackenrich's statement that if Alcorn had neuropsychiatric symptoms in April or May of 2014, and also in November

7

2014, it would not necessarily be from the same cause. (*Id.* at 81.) However, Dr. Brackenrich clearly testified that Alcorn's psychiatric problems began in April 2014, and that these problems were due to her exposure to 1-bromopropane. (*Id.* at 46–47, 77.) As such, Dr. Brackenrich's opinion does not raise factual questions as to the date of Alcorn's injury.

Further, Alcorn contends that Dr. Sanderson's conclusion that she "experienced a progression of symptoms" indicates that the bromine toxicity had not accumulated to the point of injury prior to November 2014. (Pl.'s Opp'n 8.) Nevertheless, plaintiff's first injurious symptom due to her 1-bromopropane exposure—despite later progression in the severity of her symptoms—marks the date of her injury under the statute of limitations. *See St. George*, 484 S.E.2d at 890. Here, that is either the immediate rash she developed or the deer incident, both of which occurred before November 2014.

Last, Alcorn argues that Dr. Cramer marked the beginning of Alcorn's paranoid behavior as November 2014. (Pl.'s Opp'n 9–10.) However, when Dr. Cramer testified and was presented with information previously unknown to her, including Alcorn's own testimony, she changed her position and testified that Alcorn's paranoia, caused by exposure to 1-bromopropane, began in April 2014. (Cramer Dep. 76–78, Dkt. No. 76-3.)

Therefore, when taken together, Alcorn's testimony and the experts' opinions in this case establish that Alcorn's injury caused by exposure to 1-bromopropane occurred prior to November 2014 and her claim is thus barred by the statute of limitations. For these reasons, the court concludes that defendants have satisfied their burden to establish that the statute of limitations bars plaintiff's claims. Crest and Reliance are therefore entitled to summary judgment on all claims.

## III. CONCLUSION

For the reasons set forth above, the defendants' motions for summary judgment will be granted.

A separate order will be entered.

Entered: September 6, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge